LAURA J. BAUGHMAN
CA Bar No. 263944
MARTIN BAUGHMAN, PLLC
3141 Hood Street, Suite 600
Dallas, Texas 75219
(214) 761-6614
(214) 744-7590 (facsimile)
lbaughman@martinbaughman.com
ATTORNEY FOR PLAINTIFF
ALMA URIBE

## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA
## SOUTHERN DIVISION

| | |
|---|---|
| ALMA URIBE, ) | CASE No.: _____ |
| Plaintiff, ) | |
| v. ) | |
| ) | |
| COLOPLAST ) | COMPLAINT FOR DAMAGES |
| CORPORATION, ) | Product Liability, Negligence, Strict |
| ) | Liability |
| Defendant. ) | |
| ) | |
| _____ ) | |

## COMPLAINT FOR DAMAGES AND JURY DEMAND

Plaintiff ALMA URIBE ("Plaintiff") files this Complaint, and for causes of action against Defendant COLOPLAST CORPORATION ("Coloplast" or "Defendant"), alleges as follows:

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(a) inasmuch as the amount in controversy exceeds $75,000 and the Plaintiff is a citizen of a different state than Defendant.

1

2.     At all times material hereto, Defendant was engaged in the business of developing, manufacturing, licensing, promoting, marketing, distributing, testing, warranting, and/or selling in interstate commerce throughout the United States, including California, either directly or indirectly, medical devices intended to treat stress urinary incontinence and/or pelvic organ prolapse, including the Coloplast Aris Sling System that was used to implant the Aris device (the "Aris") into Plaintiff in California.

3.     Venue in this district for pretrial proceedings in these civil actions is proper under 28 U.S.C. § 1391, inasmuch as a substantial part of the events or omissions giving rise to the claim occurred in this district.  Specifically, Plaintiff was implanted with the product at issue at the Mission Hospital in Laguna Beach in this district and was injured in this district.

4.     Defendant is subject to *in personam* jurisdiction in the U.S. District Court for the Central District of California because Defendant placed defective products in the stream of commerce and all or some of those products were implanted into and caused personal injuries to Plaintiff, a California resident, in the State of California.  Each Defendant has sufficient minimum contacts in California or otherwise intentionally avails itself of the California market through, without limitation, its advertisement, promotion, marketing, sales, and/or distribution and other business activities, so as to render the exercise of jurisdiction over it by the California courts consistent with traditional notions of fair play and substantial justice.

## PARTIES

5.      Plaintiff ALMA URIBE is a citizen and resident of Orange, California who was implanted with Defendant's defective medical device in Laguna Beach, California.

6.      Defendant Coloplast Corporation is a corporation organized and existing under the laws of the State of Delaware, maintaining its principal place of business at 1601 West River Road North, Minneapolis, Minnesota 55411.  It may be served with process by delivering same to its registered agent in the State of California, CORPORATION SERVICE COMPANY WHICH WILL DO BUSINESS IN CALIFORNIA AS CSC - LAWYERS INCORPORATING SERVICE, 2710 Gateway Oaks Drive, Sacramento, California 95833.

## FACTUAL BACKGROUND

### *Treatment of Pelvic Organ Prolapse and Stress Urinary Incontinence*

7.      At all times material to this action, Defendant was in the business of developing, designing, licensing, manufacturing, distributing, selling, marketing, advertising, and delivering, and introducing into interstate commerce, including, *inter alia*, within the United States and within the State of California, either directly or indirectly through third parties, subsidiaries or related entities, a line of pelvic mesh products (the "Pelvic Mesh Products"), including the Aris, the product implanted into Plaintiff. These products were designed primarily for the purpose of treating stress urinary incontinence as well as pelvic organ prolapse.

8.      A pelvic organ prolapse ("POP") occurs when a pelvic organ, such as the bladder, drops ("prolapses") from its normal position and pushes against the walls of the vagina.  Prolapse can happen if the muscles that hold the pelvic organs in place become weak or stretched from childbirth or surgery.  More than one pelvic organ can prolapse at the same time.  Organs that can be involved in a pelvic organ prolapse include the bladder, the uterus, the bowel and the rectum.

9.      Stress urinary incontinence ("SUI") is a type of incontinence characterized by leakage of urine during moments of physical stress, such as coughing, laughing, or sneezing.  At all relevant times, the Aris was intended to be used, and for Plaintiff was used, to treat stress urinary incontinence.

10.     Each of these Pelvic Mesh Products were cleared (not approved) for sale in the United States after the Defendant made assertions to the Food and Drug Administration of "Substantial Equivalence" under Section 510(k) of the Food, Drug and Cosmetic Act; this process does not require the applicant to prove safety or efficacy.

11.     Surgical mesh is a medical device that is generally used to repair weakened or damaged tissue.  This is the type of mesh used in Defendant's Pelvic Mesh Products, including the Aris product at issue in this case.  In urogynecologic procedures, surgical mesh is permanently implanted to reinforce the weakened vaginal wall to repair POP or to support the urethra to treat SUI.  Most pelvic mesh products, including the Aris product at issue in this case, are comprised of non-absorbable, synthetic, monofilament polypropylene mesh.

12.     Despite claims that polypropylene mesh is inert, the scientific evidence shows that this material as implanted in Plaintiff and others is biologically incompatible with human tissue, and when used as a woven or knitted alloplastic textile prosthetic mesh for pelvic floor repair, polypropylene and other surgical polymers promote a severe foreign body reaction and chronic inflammatory response in a large subset of the population implanted with Defendant's Pelvic Mesh Products. This "host defense response" by a woman's pelvic tissues promotes degradation of the polypropylene mesh and the pelvic tissue, and causes chronic inflammation of the pelvic tissue, shrinkage or contraction of the mesh leading to nerve entrapment, further inflammation, chronic infectious response, and chronic pain. It also can cause new-onset painful sexual relations, significant urinary dysfunction, vaginal shortening and anatomic deformation, and can contribute to the formation of severe adverse reactions to the mesh.

13.     When the Pelvic Mesh Products, including the Aris product at issue in this case, are inserted in the female body according to the manufacturers' instructions, it creates a non-anatomic condition in the pelvis leading to chronic pain and functional disabilities.

14.     In 1996, the FDA cleared the first pelvic mesh products for use in the treatment of SUI.   These products include products manufactured, marketed, and distributed by Defendant.   These products were and are approved by the FDA under the abbreviated 510(k) approval process.   Section 510(k) provides for marketing of a medical device if the device is deemed "substantially equivalent" to other predicate devices marketed before May 28, 1976.   No formal review for safety or efficacy is required, and no formal review for safety or efficacy was ever conducted with regard to these pelvic

mesh products, including the Aris product at issue in this case.

### History of the Aris Product

15.     Many of the Defendant's Pelvic Mesh Products, including the Aris product at issue in this case, were developed and/or acquired as a result of the acquisition by Coloplast of Mentor Corporation ("Mentor")'s surgical, urological, clinical, and consumer healthcare business segments in June 2006.

16.     On February 8, 2001, Mentor announced the purchase of Porges S.A., a subsidiary of Sanofi-Synthelabo.  At the time, Porges held the leading market share for urological products in France and held a strong position throughout Europe was one of the largest manufacturers of urological products, supplying a complete range of products including pelvic mesh products.

17.     On January 24, 2005, Mentor applied for 510(k) clearance for a new product, the Aris$^{(TM)}$ Trans-Obturator Tape and Surgical Kit.  In the 510(k) Summary (K050148) for the Aris, Defendant states "the Mentor Aris Trans-obturator Tape and the Kit are substantially equivalent in material, function, performance and design to the Mentor ObTape Trans-Obturator Tape and Surgical Kit cleared under 510(k) K031767 and K042851, respectively.  It is also substantially equivalent to other urethral support tape products currently on the market." The Aris received 510(k) clearance from the FDA on March 9, 2005.

18.     In May 2005, Mentor announced the U.S. launch of its new Aris$^{(TM)}$ Trans-Obturator Tape.  According to Mentor's launch reports, "specifically designed to utilize Mentor's patented Trans-Obturator Technique (T.O.T.$^{(TM)}$), Aris represents the newest

technical achievement and advanced generation of trans-obturator slings for the treatment of stress urinary incontinence in women." "The introduction of Aris furthers Mentor's position as a pioneer of the trans-obturator method for treating stress incontinence in women," commented Joshua H. Levine, President and Chief Executive Officer of Mentor Corporation. "We are committed to driving innovation in the field of women's health to provide better solutions for physicians and the patients they serve." Analytic Biosurgical Solutions ("ABISS") FDA registration lists its proprietary device as "Mentor Aris Trans-Obturator Tape and Surgical Kit."

19.    On October 12, 2005, ABISS and Mentor entered into a number of agreements pursuant to which ABISS licensed a number of ABISS' products to Mentor, which were thereafter marketed by Mentor under its trademarks, including its Aris trademark.

20.    On June 2, 2006, Mentor sold its surgical, urological, clinical and consumer healthcare business segments to Coloplast for $461,145,398, including *inter alia*, Mentor's October 12, 2005, agreements with ABISS and Mentor's Aris and Novasilk Pelvic Mesh Products.

21.    At all times, the product marketed and sold in the United States as "Mentor Aris Trans-Obturator Tape and Surgical Kit" was manufactured by ABISS and, at all times after October 2, 2006, the product "Mentor Aris Trans-Obturator Tape and Surgical Kit" was exclusively marketed and sold in the United States by Coloplast Corp. from its principal place of business in Minneapolis, Minnesota.

22.     ABISS is registered with the FDA, Registration Number 3004756681, as the manufacturer of "Mentor Aris Trans-Obturator Tape and Surgical Kit."

23.     On December 5, 2005, Mentor obtained 510(k) clearance for Mentor NovaSilk Mesh. Mentor NovaSilk Mesh is a permanent, synthetic knitted propylene mesh that is square in shape and is a sterile, single use device.   The Mentor NovaSilk Mesh obtained 510(k) clearance based on substantial equivalence in material, function, performance, and design to the Gynemesh Prolene Soft (Polypropylene) Mesh cleared under 510(k) K013718 and knitted polypropylene already in use under Mentor's Aris Sling cleared under 510(k) K050148.   Joshua H. Levine, President and Chief Executive Officer of Mentor Corporation commented, "The addition of NovaSilk to Mentor's expanding portfolio of women's health products for pelvic organ prolapse or stress urinary incontinence reinforces the commitment of our urology franchise to surgeons and the patients they serve by providing high quality product offerings and customer service and support."

24.     Coloplast Corp.'s annual report for 2009-2010 reported that "the majority of our acquired patents and trademarks are associated with the acquisition of Mentor's urology, business in 2006."   The annual report also said that Mentor signed "a non-competition clause prohibiting Mentor (the seller) from selling urology products for the next seven years…."

25.     Coloplast Corp. began marketing the Exair Prolapse Repair System in May 2009 to treat pelvic organ prolapse. This product is made of NovaSilk Mesh, precut into the necessary shape with four mesh arms extending from the main body, which are used to

implant the device. This product obtained 510(k) clearance based on its substantial equivalence with Coloplast Corp.'s (formerly Mentor's) NovaSilk Mesh, and Gynecare Prolift Total Pelvic Floor Repair System cleared under pre-market notification number K071512 on May 15, 2008.

26.     On October 29, 2010, Coloplast Corp. acquired Mpathy Medical Devices, Inc. ("Mpathy"). Mpathy was founded in 2003, with the aim of developing less invasive surgical solutions for the treatment of female stress urinary incontinence and pelvic organ prolapse. Mpathy's core product lines included Minitape® and Omnisure® for stress urinary incontinence, and the Restorelle® family for pelvic organ prolapse.  Defendant Coloplast Corp. said of the acquisition that Coloplast Corp.'s market position in Surgical Urology and Female Pelvic Health would immediately strengthen based on Mpathy's product portfolio including slings, mini-slings and meshes for stress urinary incontinence and pelvic floor repair and material portfolio including Smartmesh® technology.

27.     Coloplast Corp.'s website describes its various products, including those  for treating (i) "Pelvic Organ Prolapse" and (ii) "Stress Urinary Incontinence," including "Sling Procedures."  A press release issued by Coloplast Corp. described Coloplast Corp.'s new corporate headquarters at 1601 West River Road in Minneapolis and stated that "Denmark-based Coloplast…selected north Minneapolis as the new home for its North American headquarters in 2006."  According to the press release the new headquarters "will include one of the company's three global Innovation Centers."

### *Warnings Regarding Pelvic Mesh Products*

28.     On July 13, 2011, the FDA issued a new warning regarding serious complications associated with pelvic mesh products, such as the Pelvic Mesh Products manufactured, marketed, and distributed by Defendant. In this warning, the FDA indicated that "serious complications associated with surgical mesh for transvaginal repair of POP are **not rare**." (emphasis in the original).  The FDA had also received increased reports of complications associated with the pelvic mesh products used in both pelvic organ prolapse and stress urinary incontinence cases.

29.     The FDA Safety Communication also stated, *"Mesh contraction* (shrinkage) is a *previously unidentified risk of* transvaginal POP repair with mesh that has been reported in the published scientific literature and in adverse event reports to the FDA . . . Reports in the literature associate mesh contraction with vaginal shortening, vaginal tightening and vaginal pain." (emphasis in original).

30.     The FDA Safety Communication further indicated that the benefits of using pelvic mesh products instead of other feasible alternatives did not outweigh the associated risks. Specifically, the FDA Safety Communication stated: "it is not clear that transvaginal POP repair with mesh is more effective than traditional non-mesh repair in all patients with POP and it may expose patients to greater risks."

31.     Contemporaneously with the Safety Communication, the FDA released  a publication titled "Urogynecologic Surgical Mesh: Update on the Safety and Effectiveness of Transvaginal Placement for Pelvic Organ Prolapse" (the "White Paper"). In the White Paper, the FDA noted that published, peer-reviewed literature demonstrates that "[p]atients

who undergo POP repair with mesh are subject to mesh-related complications that are not experienced by patients who undergo traditional surgery without mesh."

32.     The FDA summarized its findings from its review of the adverse event reports and applicable literature stating that it "has NOT seen conclusive evidence that using transvaginally placed mesh in POP repair improves clinical outcomes any more than traditional POP repair that does not use mesh, and it may expose patients to greater risks." (Emphasis in original).

33.     The White Paper further stated that "these products are associated with serious adverse events . . . Compounding the concerns regarding adverse events are performance data that fail to demonstrate improved clinical benefit over traditional non-mesh repair." In its White Paper, the FDA advises doctors to, *inter alia*, "[r]ecognize that in most cases POP can be treated successfully without mesh thus avoiding the risk of mesh related complications." The White Paper concludes by stating that the FDA "has identified serious safety and effectiveness concerns over the use of surgical mesh for the transvaginal repair of pelvic organ prolapse."

34.     On August 25, 2011, Public Citizen, a consumer advocacy group, submitted a petition to the FDA seeking to ban the use of pelvic mesh products in pelvic repair procedures. In its Petition, Public Citizen warned that pelvic mesh products should be recalled because they offer no significant benefits but expose patients to serious risks and the potential for permanent life-altering harm. Joining Public Citizen as co-petitioners were Dr. L. Lewis Wall, a professor of obstetrics and gynecology at Washington University in St. Louis, and Dr. Daniel S. Elliott, a urologic surgeon specializing in female urology at

the Mayo Clinic in Rochester, Minnesota.

35.    In a December 2011 Joint Committee Opinion, the American College of Obstetricians and Gynecologists ("ACOG") and the American Urogynecologic Society ("AUGS") also identified physical and mechanical changes to the transvaginal mesh inside the body as a serious complication associated with transvaginal mesh, stating:

> **There are increasing reports of vaginal pain associated with changes that can occur with mesh (contraction, retraction, or shrinkage) that result in taut sections of mesh… Some of these women will require surgical intervention to correct the condition, and some of the pain appears to be intractable.**

36.    The ACOG/AUGS Joint Committee Opinion also recommended, among other things, that "[p]elvic organ prolapse vaginal mesh repair should be reserved for high-risk individuals in whom the benefit of mesh placement may justify the risk."

37.    As is known to Defendant, the risks associated with POP repair are the same as SUI repair. However, the data regarding the magnitude and frequency of these known risks are not as developed as the data on POP repair. The FDA recognized this, as demonstrated by its Section 522 Orders issued to manufacturers of pelvic mesh products used to treat SUI in January of 2012.

38.    In September 2011, the FDA acknowledged the need for additional data and noted in "Surgical Mesh For Treatment of Women with Pelvic Organ Prolapse and Stress Urinary Incontinence" that the literature and information developing on SUI repair with Pelvic Mesh Products "indicates that serious complications can occur . . . [and] a case can be made for additional premarket and/or post market studies to better address the risk/benefit of all mesh products used for SUI."

39.     After the 2011 FDA notification that mesh complications from POP repairs were "not rare," a 2013 article was published that stated: "as outlined in the FDA notifications, patients should be forewarned that some transvaginal mesh complications are life altering and might not always be surgically correctable. Furthermore, that study noted that "the women who received both MUS and TM represented a complicated surgical group. Fifteen women (43%) required MUS takedown concurrently with prolapse mesh excision. Two-thirds of these women had associated chronic pelvic pain and vaginal pain, in addition to their urinary symptoms."

40.     On April 16, 2019, the FDA ordered all manufacturers of surgical mesh intended for transvaginal repair of anterior compartment prolapse (cystocele) to stop selling and distributing its products immediately. In fact, the FDA has determined that the manufacturers, Boston Scientific and Coloplast specifically, have not demonstrated reasonable assurance of safety and effectiveness for these devices, which is the premarket standard that now applies to them since the agency reclassified them into class III (high risk) in 2016.[1]

41.     Defendant did not, and has not, adequately studied the extent of the risks associated with its Pelvic Mesh Products. In January 2012, the FDA recognized the risk to women and mandated additional studies to further investigate these risks.

---

[1] www.fda.gov/medical-devices/implants-and-prosthetics/urogynecologic-surgical-mesh-implants.

*Defective Design*

42.    Defendant knew or should have known that its Pelvic Mesh Products, including the Aris product at issue in this case, unreasonably exposed patients to the risk of serious harm while conferring no benefit over available feasible alternatives that do not involve the same risks.  At the time Defendant began marketing the Aris, Defendant was aware that the Aris was associated with each and every one of the adverse events communicated by the FDA in its July 13, 2011, safety communication.

43.    The Aris was designed to be permanently implanted into a woman's body yet the product changes after implantation; it contracts over time which *inter alia,* can pull or compress nerves, muscles, and other soft tissues important for sexual function, mobility, bowel function, and bladder function.  These product changes occur while the product is implanted.

44.    Moreover, despite claims that polypropylene mesh is inert, the scientific evidence shows that this material as implanted in Plaintiff is biologically incompatible with human tissue and when used as a woven or knitted alloplastic textile prosthetic mesh for pelvic floor repair, polypropylene and other surgical polymers promote a severe foreign body reaction and chronic inflammatory response in a large subset of the population implanted with Defendant's Pelvic Mesh Products, including the Aris product at issue herein.  This "host defense response" by a woman's pelvic tissues promotes degradation of the polypropylene mesh and the pelvic tissue, causes chronic inflammation of the pelvic tissue, causes shrinkage or contraction of the mesh leading to nerve entrapment, further inflammation, chronic infectious response and chronic pain, cause new-onset painful

sexual relations, significant urinary dysfunction, vaginal shortening and anatomic deformation, and can contribute to the formation of severe adverse reactions to the polypropylene mesh.

45.    The FDA defines both "degradation" and "fragmentation" as "device problems" to which the FDA assigns a specific "device problem code." "Material Fragmentation" is defined as an "[i]ssue associated with small pieces of the device breaking off unexpectedly" and "degraded" as an "[i]ssue associated with a deleterious change in the chemical structure, physical properties, or appearance in the materials that are used in device construction."

46.    Defendant makes the following statements regarding its Pelvic Mesh Products:

> [Aris has] Low rate of particle release from the sling-**minimizes increase in inflammatory response**. Atraumatic, smooth edges allow for easy passage during implantation. Macroporous design allows for optimal tissue integration. (emphasis added).

47.    Contrary to Defendant's assertions that its products minimize increase in inflammatory response:

a)    In September 2009, results from a study were published in the BMC Women's Health relating to the comparison of host response and complications in patients implanted with Coloplast's Aris.  Implants from the Aris group showed an **increase risk of erosion which was quantified at 4%.**  Kaelin-Gambirasio I, *Complications associated with transobturator sling procedures: analysis of 233 consecutive cases with a 27 months follow-up.* BMC Womens Health. 2009 Sep

25; 9:28.

b) In September 2012, results from a study were published in the World Journal of Urology relating to the comparison of TVT vs TOT slings. 15 of 71 patients suffered adverse events including infection and erosion, **two thirds of which were implanted with the Aris.** Wadie BS, *TVT versus TOT, 2-year prospective randomized study*. World J Urol. 2012 Sep 26.

48.    Defendant makes the following statements regarding its Pelvic Mesh Products:

> Novasilk is one of the lightest weight, thinnest meshes on the market, which translates into a more conforming mesh that may **reduce cases of inflammation, infection, or erosion** by having less implanted material.

49.    Contrary to Defendant's assertions that its products are resistant to significant inflammation, infection or erosion:

a) Complications from mesh placement for pelvic organ prolapse include among other adverse events: acute and chronic infection, tissue contraction due to mesh shrinkage, erosion of the mesh into adjacent structures, and dyspareunia. [painful sexual intercourse].  Cosson, M., et al., *Mechanical properties of synthetic implants used in the repair of prolapse and urinary incontinence in women: which is the ideal material?* Int Urogynecol J Pelvic Floor Dysfunct, 2003. 14(3): p. 169-78; discussion 178. Jones, K.A., et al., *Tensile properties of commonly used prolapse meshes.* Int Urogynecol J Pelvic Floor Dysfunct, 2009. 20(7): p. 847-53. Margulies, R.U., et al., *Complications requiring reoperation following vaginal mesh kit procedures for prolapse.* Am J Obstet Gynecol,

2008. 199(6): p. 678 e1-4.

b) Erosion can be defined as the mesh wearing, or slowly grinding through the vaginal wall. This is a serious complication and moreover, there is evidence that meshes shrink *in vivo* leading to increased stiffness, pain and poor restoration of the normal properties of the vagina. Dora, C.D., et al., *Time dependent variations in biomechanical properties of cadaveric fascia, porcine dermis, porcine small intestine submucosa, polypropylene mesh and autologous fascia in the rabbit model: implications for sling surgery.* J Urol, 2004. 171(5): p. 1970-3.

c) Larger pores within polypropylene mesh materials, allowing macrophage and leukocyte migration, reduce infection.  Birch C, Fynes MM. The role of synthetic and biological prosthesis in reconstructive pelvic floor surgery. *Curr Opin Obstet Gynecol*. 2002; 14:527–595. 22. Govier FE, Kobashi KC, Kozlowski PM, Kuznetsov DD, Begley SJ, McGonigle KF, et al. High complication rate identified in sacrocolpopexy patients attributed to silicone mesh. *J Urol*. 2005; 65:1099–1103.

d) In a study published in August 2012, Defendant's Novasilk was compared to other polypropylene on the market relating structural properties. Novasilk was found to have less porosity and increased stiffness than several of the other studied products—supporting clinical observations among Plaintiff's surgeons and the causative conclusion that properties of Defendant's mesh led to Plaintiff's complications.  Feola A, *Characterizing the ex vivo textile and*

*structural properties of syntheticprolapse mesh products*. Int Urogynecol J. 2012 Aug 11.

50.     Defendant's Pelvic Mesh Products, including the Aris product at issue, were and are unreasonably susceptible to degradation and fragmentation inside the body, shrinkage or contraction inside the body, intense foreign body reaction, chronic inflammatory response, chronic wound healing, chronic infections in and around the mesh fibers, and nerve entrapment in the collagen scar formation. Defendant knew or should have known of these serious risks and should have, therefore, warned physicians and patients regarding these risks to the extent they were known or knowable.

51.     To this day, the Aris continues to be marketed to the medical community and to patients as a safe, effective, and reliable medical device, implanted by safe, effective, and minimally invasive surgical techniques, and as safer and more effective as compared to available feasible alternative treatments of POP and SUI, and other competing products.

52.     Defendant omitted and downplayed the risks, dangers, defects, and disadvantages of its Pelvic Mesh Products, including the Aris product at issue, and advertised, promoted, marketed, sold and distributed the its Pelvic Mesh Products, including the Aris product at issue, as safe medical devices when Defendant knew or should have known that the Pelvic Mesh Products were not safe for their intended purposes, and that the products would cause, and did cause, serious medical problems, and in many patients, including Plaintiff, catastrophic injuries. Further, while some of the problems associated with the pelvic mesh products, including the Aris, were made known to physicians, the magnitude and frequency of these problems were not disclosed and were

hidden from physicians.

53.    Contrary to Defendant's representations and marketing to the medical community and to the patients themselves, its Pelvic Mesh Products, including the Aris product at issue, have high rates of failure, injury, and complications, fail to perform as intended, require frequent and often debilitating re-operations, and have caused severe and irreversible injuries, conditions, and damage to a significant number of women, including the Plaintiff, making them defective under the law.

54.    Defendant failed to design and establish a safe, effective procedure for removal of its Pelvic Mesh Products, including the Aris product at issue, or to determine if a safe, effective procedure for removal of the Pelvic Mesh Products exists.

55.    Feasible, suitable, and safer alternative designs to Defendant's Pelvic Mesh Products, including the Aris product at issue, have existed at all times relevant and in reasonable probability would have prevented or significantly reduced the risk of Plaintiff's injuries without substantially impairing the product's utility.  Said safer alternative designs were economically and technologically feasible at the time the Aris product left the control of Defendant by the application of existing or reasonably achievable scientific knowledge. Said safer alternatives designs include, but are not limited to: (1) traditional abdominal surgery using sutures to attach the urethra to a ligament in the pelvis (known as the "Burch procedure"); (2) autologous fascia sling; (3) an allograft sling such as Repliform; (4) a retropubic sling; (5) a retropubic sling with less polypropylene, such as Ultrapro; and (6) a retropubic sling with a polymer-based polypropylene alternative, such as PVDF.

56. The specific nature of defects for Defendant's Aris device at issue in this case includes, but is not limited to, the following:

a) The use of polypropylene in the Aris and the adverse tissue reactions and host defense response that result from such material, causing adverse reactions and serious, permanent injuries including, but not limited to, painful recurrent erosions and associated intractable pain;

b) The design of the Aris to be inserted into and through an area of the body that is blood vessel rich, nerve dense, and bacteria laden leading to excessive blood loss and vascular damage, permanent nerve injury and associated chronic, intractable neuropathic pain, contaminated permanently-implanted mesh causing chronic infections, subclinical infections and biofilms, enhanced chronic inflammatory response, chronic wound healing with tissue destruction, as well as numerous other adverse reactions and serious and permanent injuries;

c) The use and design of arms and hooked anchors in the Aris sling, which, when placed in the women, are likely to pass through contaminated spaces and that can injure major nerve routes in the pelvic region;

d) The procedure to place the Aris sling requires blindly placing the arms the device through the thigh and obturator fossa that can injure major nerves that contribute to sexual function, contribute to mobility, and contribute to bowel and bladder function;

e) Biomechanical issues with the design of the Aris which results in a non-anatomic condition leading to contraction or shrinkage of the mesh inside the body, that in turn causes surrounding tissue to become eroded, inflamed, fibrotic and infected, resulting in serious and permanent injury;

f) The propensity of the mesh design characteristics of the Aris for plastic deformation when subjected to tension both during implantation and once implanted inside the body which causes the mesh, or portions thereof, to be encapsulated in a rigid scar plate which leads to nerve entrapment, bacterial entrapment, tissue destruction, enhanced inflammatory and fibrotic response and chronic pain;

g) The propensity of the mesh used in the Aris to become rigid and inflexible, causing it to be improperly mated to the delicate and sensitive areas of the vagina and pelvis where the product is implanted, and causing discomfort and pain with normal daily activities that involve movement in the pelvic region (e.g., intercourse, defecation, walking);

h) The propensity of the mesh used in the Aris for degradation or fragmentation over time, which causes an increased surface area that leads to enhanced chronic inflammatory and fibrotic reaction, causes a "barbed wire" or "saw blade" effect by the fragmented surface "sawing" through the tissue, leads to bacteria harboring in the fragmented, peeled and split fiber surface which in turn leads to chronic infections at the mesh surface, and results in continuing injury over

time; and

i)   The inability of surgeons to effectively treat many of these conditions due to the
integration of the mesh into the pelvic tissue and thus the inability to safely
remove or excise the mesh once a complication occurs.

### *Failure to Warn/Inadequate Warnings & Instructions*

57.     The Aris is also defective due to Defendant's failure to adequately warn or
instruct Plaintiff and/or her health care providers after the product left the manufacturer
and before and after implantation of the Aris of subjects including, but not limited to, the
following:

a)   The Product's propensities to contract, retract, and/or shrink inside the body;

b)   The Product's propensities for degradation, fragmentation and/or migration;

c)   The Product's inelasticity preventing proper mating with the pelvic floor and
vaginal region;

d)   The frequency and manner of transvaginal mesh erosion or extrusion resulting
from the Product;

e)   The risk of chronic inflammation resulting from the Product;

f)   The risk of chronic infections resulting from the Product;

g)   The risk of permanent vaginal or pelvic scarring resulting from the Product;

h)   The risk of *de novo* urinary dysfunction resulting from the Product;

i)   The risk of *de novo* dyspareunia or painful sexual intercourse resulting from the
Product;

j)  The risk of recurrent, intractable pelvic pain, extrapelvic pain, and other pain resulting from the Product;

k)  The need for corrective or revision surgery to adjust or remove the Product which in some cases is not feasible nor possible;

l)  The severity of complications that could arise as a result of implantation of the Product;

m) The hazards associated with the Product;

n)  The Product's defects described herein;

o)  Treatment of stress urinary incontinence with Defendant's Product is no more effective than feasible, available and safer alternatives;

p)  Treatment of stress urinary incontinence with Defendant's Product exposes patients to greater risk than feasible, available and safer alternatives;

q)  Treatment of stress urinary incontinence with the Product makes future surgical repair more difficult than feasible, available and safer alternatives;

r)  Use of the Product puts the patient at greater risk of requiring additional surgery than feasible, available and safer alternatives;

s)  Removal of the Product due to complications may involve multiple surgeries and may significantly impair the patient's quality of life;

t)  Complete removal of the Product may not be possible and may not result in complete resolution of the complications, including pain; and

u)  The nature, magnitude, and frequency of the complications that could arise as a result of implantation of the Product.

58.     Defendant underreported and continues to underreport information about the propensity of its Pelvic Mesh Products, including the Aris product at issue, to fail and cause injury and complications and have made unfounded representations regarding the efficacy and safety of the Pelvic Mesh Products through various means and media.

59.     Defendant underreported and continues to underreport information about the propensity of its Pelvic Mesh Products, including the Aris product at issue, to fail and cause injury and complications and have made unfounded representations regarding the efficacy and safety of its Pelvic Mesh Products, including the Aris product at issue, through various means and media.

60.     Defendant failed to perform proper and adequate testing and research in order to determine and evaluate the nature, magnitude and frequency of the risks attendant to its Pelvic Mesh Products, including the Aris product at issue.

61.     The Aris product at issue was at all times utilized and implanted in a manner intended and/or foreseeable to Defendant, as Defendant generated the instructions for use, created the procedures for implanting the devices, and trained the implanting physician.

62.     Defendant knowingly provided incomplete and insufficient training and information to physicians regarding the use of its Pelvic Mesh Products, including the Aris product at issue, and the aftercare of patients implanted with those Pelvic Mesh Products.

63.     At all relevant times herein, Defendant continued to promote its products as safe and effective even when no clinical trials had been done supporting long-term or short-term efficacy or safety.

64.     In doing so, Defendant failed to disclose the known risks and failed to warn of known or scientifically knowable dangers and risks associated with its Pelvic Mesh Products, including the magnitude and frequency of these risks.

65.     At all relevant times herein, Defendant failed to provide sufficient warnings and instructions that would have put Plaintiff, the medical community, Plaintiff's treating physicians, and the general public on notice of the dangers and adverse effects caused by implantation of the Defendant's Pelvic Mesh Products, including the Aris product at issue.

66.     Defendant's Pelvic Mesh Products, including the Aris product at issue, as designed, manufactured, distributed, sold and/or supplied by Defendant, were defective as marketed due to inadequate warnings, instructions, labeling and/or inadequate testing in the presence of Defendant's knowledge of lack of safety.

67.     The risk of serious injuries was known or should have been known to Defendant, but in spite of these risks, Defendant continued to market the Aris for transvaginal use to physicians and patients, including Plaintiff and Plaintiff's healthcare providers, without adequate warnings.

### *Resulting Injury from Defendant's Pelvic Mesh Products*

68.     The injuries, conditions, and complications suffered by numerous women around the world who have been implanted with Defendant's Pelvic Mesh Products include, but are not limited to: erosion, mesh contraction, infection, fistula, inflammation, scar tissue, organ perforation, dyspareunia (pain during sexual intercourse), blood loss, neuropathic and other acute and chronic nerve damage and pain, obturator nerve damage/irritation, pudendal nerve damage/irritation, pelvic floor damage, chronic pelvic

pain, chronic extrapelvic pain, chronic groin pain, chronic thigh pain, emotional distress and mental anguish, and other debilitating complications. In addition, affected women, including Plaintiff, will need to be continuously monitored because of being implanted with Defendant's Pelvic Mesh Products.

69.     In many of these cases, including that of the Plaintiff, women have had or will have to undergo extensive medical treatment, including, but not limited to, operations to locate and remove mesh, operations to attempt to repair pelvic organs, tissue, and nerve damage, the use of pain control and other medications, injections into various areas of the pelvis, spine, and the vagina, and operations to remove portions of the female genitalia. Removal of contracted, eroded and/or infected transvaginal mesh can require multiple surgical interventions for removal of mesh and results in scarring on fragile compromised pelvic tissue and muscles.

70.     The medical and scientific literature studying the effects of pelvic mesh products, like that of the Aris product implanted in Plaintiff, has examined each of these injuries, conditions, and complications, and has reported that they are causally related to the pelvic mesh products.

### *Facts Specific as to Plaintiff*

71.     On February 12, 2014, at Mission Hospital in Laguna Beach, California, Red Alinsod, M.D., implanted Plaintiff Alma Uribe with a Coloplast Aris Trans-Obturator Sling, as follows:

```
Patient Record Label          Etiquette Patient
Aris™                          Ans
Trans-obturator Tape          Bandelette transobturatrice

Catalog number / 93-4001      Batch code /   AM100055
Code du produit 5195102400    Code de fournée

Manufacturer/Fabricant        Use by /       2017-09
Coloplast A/S                 Utilisez par
3050 Denmark
```

72.     The Aris is a medical device designed, manufactured, and marketed by Defendant for the treatment of stress urinary incontinence.

73.     The Aris implanted in Plaintiff was in the same or substantially similar condition as it was when it left Defendant's possession, and in the condition directed by and expected by Defendant.  Plaintiff's treating physicians implanted the Aris properly and appropriately.

74.     Although the system was intended to treat SUI, neither Plaintiff nor her healthcare providers were warned that the Aris was defective and negligently designed and marketed, as discussed further herein.

75.     In or around November 2020, Plaintiff began experiencing dyspareunia, groin pain, thigh pain, vaginal pain, painful bladder filling, and recurring urinary tract infections. After conservative treatment for her symptoms failed, on April 19, 2021, Plaintiff underwent a mesh explantation procedure performed by Dr. Dionysios Veronikis, MD at Mercy Hospital in St. Louis, Missouri.  During the procedure, Dr. Veronikis discovered vaginal, bladder and urethral scarring, found the mesh from the Aris sling implanted deeply in the muscles of the groin, and noted that the "mesh was at the bladder neck deformed and folded in orientation."

76.     Today, Plaintiff continues to experience problems including groin pain, pelvic pain, extrapelvic pain, thigh pain vaginal pain, painful intercourse, and urinary problems and requires ongoing medical care for her painful mesh-related conditions.

## DISCOVERY RULE

77.     Plaintiff re-alleges and incorporates by reference each of the foregoing paragraphs of this Complaint as if fully set forth herein and to the extent necessary would allege as follows:

78.     Plaintiff could not have reasonably discovered the occasion, manner and/or means by which Defendant's breach of duty occurred until within two years of the filing of this complaint. Further, Plaintiff did not and, exercising reasonable diligence, including consultation with medical professionals, could not discover the existence of her legal cause of action or the injuries caused by Defendant's breach of duty and/or defective products until within two years of the filing of this complaint. Defendant continues to deny that its products are defective or cause injuries such as those suffered by Plaintiff and Defendant continues to manufacture, market, and sell all or some of the products at issue. Any applicable statute of limitations has been tolled by the knowing and active concealment and denial of material facts known by Defendant when Defendant had a duty to disclose and/or by the application of the discovery rule.

## COUNT I
## STRICT LIABILITY – MARKETING DEFECT (FAILURE TO WARN)

79.     Plaintiff re-alleges and incorporates by reference each of the foregoing paragraphs of this Complaint as if fully set forth herein and further allege as follows:

80.     Defendant designed, researched, developed, manufactured, tested, labeled, advertised, promoted, marketed, sold, supplied, and/or distributed the Pelvic Mesh Product at issue herein.

81.     The Aris mesh was manufactured, designed, marketed, labeled and sold in a defective condition, for use by the Plaintiff's physicians and/or healthcare providers and all other consumers of the product, making the product unreasonably dangerous.

82.     Specifically, Defendant's Aris product is defective due to Defendant's failure to adequately warn or instruct Plaintiff and/or her health care providers of subjects.

83.     In the Aris IFU, as well as the marketing materials Defendant  prepared and disseminated to patients and healthcare providers, Defendant omitted critical information regarding the risks and potential complications of the Aris product at issue in this case. Specifically, Defendant failed to properly and adequately warn and instruct Plaintiff and her healthcare providers as to the following (subsequently referred to as the "Risks and Potential Complications"):

      a.  That the Aris was not studied prior to launch for safety and efficacy;

      b.  That the Aris has propensities to contract, retract, and/or shrink inside the body;

      c.  That the Aris has propensities for degradation, fragmentation, and/or creep;

d.  That the Aris' inelasticity prevents proper mating with the pelvic floor and vaginal region;

e.  The magnitude of the risk of mesh erosion or extrusion;

f.  The risk of chronic inflammation resulting from the Aris;

g.  The risk of chronic infections resulting from the Aris;

h.  The risk of developing chronic regional pain syndrome as a result of chronic inflammation/infection;

i.  The risk of permanent vaginal or pelvic scarring as a result of the Aris;

j.  The risk and/or magnitude of recurrent, intractable pelvic pain, nerve pain, and other pain resulting from the Aris;

k.  The risk of direct nerve injury to the ilioinguinal nerve;

l.  The risk of secondary nerve injury or irritation to the ilioinguinal nerve;

m.  The risk of direct nerve injury to the pudendal nerve;

n.  The risk of secondary nerve irritation to the pudendal nerve;

o.  The risk of direct nerve injury to the obturator nerve;

p.  The risk of secondary nerve irritation to the obturator nerve;

q.  The magnitude of the risk of dyspareunia (painful sexual intercourse) in patients;

r.  That the Aris may result in dyspareunia that makes vaginal penetration impossible;

s.  The risk of vulvar, perineal, or perianal allodynia;

t.  The frequency with which the need for corrective or revision surgery to adjust or remove the Aris may occur in patients;

u.  The magnitude of the risk of acute and long-term complications that could arise as a result of implantation of the Aris in patients;

v.  The hazards associated with the Aris, including obturator, pudendal, and ilioinguinal neuralgia, permanent nerve damage, and pelvic floor and groin myalgia;

w.  That treatment of SUI with the Aris exposes patients to greater risk than feasible available devices for SUI, including pelvic mesh products utilizing alternative polypropylene material or non-polypropylene surgical products, alternatives, and procedures;

x.  That treatment with the Aris makes future surgical repair more difficult than feasible available alternatives;

y.  That the Aris offers no improvement in efficacy compared to non-mesh repairs and non-mesh repairs do not place the obturator, ilioinguinal, or pudendal nerve at risk acutely or over time;

z.  That use of the Aris puts the patient at greater risk of requiring additional surgery than feasible available alternatives;

aa. That removal of the Aris due to complications may significantly impair the patient's quality of life;

bb. That complete removal of the Aris may not be possible;

cc. That complete removal of the Aris may not result in complete resolution of the complications, including pain;

dd. The foreseeable and unavoidable risk of acute obturator or pudendal neuralgia or obturator and/or pudendal neuralgia occurring months or years after implantation;

ee. The magnitude of the risk of obturator, pudendal and/or ilioinguinal neuralgia; and

ff. The risk of permanent injury and pain to the muscles and soft tissues of the pelvic floor that may occur acutely after implantation or become symptomatic months or years after implantation.

84.     Arguing further, Defendant failed to properly and adequately warn and instruct Plaintiff and her healthcare providers as to the proper candidates for, and the safest and most effective methods of, implantation and use of Defendant's Pelvic Mesh Products, including the Aris Pelvic Mesh Product at issue in this case. Defendant also failed to properly and adequately warn and instruct Plaintiff and her healthcare providers with regard to the inadequate research and testing of the Pelvic Mesh Products, including the Aris Pelvic Mesh Product at issue in this case, and the complete lack of a safe, effective procedure for removal of the Pelvic Mesh Products.

85.     The Pelvic Mesh Product at issue herein was expected to, and did, reach the intended consumers, handlers, and persons receiving the products, including Plaintiff, with no substantial change in the condition in which the products were designed, produced, manufactured, sold, distributed, labeled and marketed by Defendant.

86.     The Pelvic Mesh Product at issue herein implanted in Plaintiff was not reasonably safe for its intended use and was defective as described herein as a matter of law due to its lack of appropriate and necessary warnings. Specifically, Defendant did not provide sufficient or adequate warnings regarding, among other subjects:

a.      The propensities of the Pelvic Mesh Product at issue herein to contract, retract, and/or shrink inside the body;

b.      The propensities of the Pelvic Mesh Product at issue herein for degradation, fragmentation, disintegration and/or creep;

c.      The inelasticity of the Pelvic Mesh Product at issue preventing proper mating with the pelvic floor and vaginal region;

d.      The rate and manner of mesh erosion or extrusion;

e.      The risk of chronic inflammation resulting from the Pelvic Mesh Product at issue herein;

f.      The risk of chronic infections resulting from the Pelvic Mesh Product at issue herein;

g.      The risk of permanent vaginal or pelvic scarring as a result of the Pelvic Mesh Product at issue herein;

h.      The risk of recurrent, intractable pelvic pain and other pain resulting from the Pelvic Mesh Product at issue herein;

i.      The need for corrective or revision surgery to adjust or remove the Pelvic Mesh Product at issue herein;

j.    The severity of complications that could arise as a result of implantation of the Pelvic Mesh Product at issue herein, including permanent nerve damage;

k.    The hazards associated with the Pelvic Mesh Product at issue herein;

l.    The defects of the Pelvic Mesh Product at issue as described herein;

m.    Treatment of stress urinary incontinence with the Aris is no more effective than feasible available alternatives;

n.    Treatment of stress urinary incontinence with the Aris exposes patients to greater risk than feasible available alternatives;

o.    Treatment of stress urinary incontinence with the Aris makes future surgical repair more difficult than feasible available alternatives;

p.    Use of the Aris product at issue herein puts the patient at greater risk of requiring additional surgery than feasible available alternatives;

q.    Removal of the Pelvic Mesh Product at issue herein due to complications may involve multiple surgeries and may significantly impair the patient's quality of life and intimate personal relationships;

r.    Complete removal of the Pelvic Mesh Product at issue herein may not be possible and may not result in complete resolution of the complications, including pain;  and

s.    The nature, magnitude and frequency of complications that could arise as a result of implantation of the Pelvic Mesh Product at issue herein.

87.     Defendant, by exercising reasonable diligence, could have made such warnings available to Plaintiff, Plaintiff's healthcare providers, and the medical community.

88.     As a direct and proximate result of Defendant's failure to provide Plaintiff, Plaintiff's healthcare providers, and the medical community with sufficient or adequate warnings, Plaintiff and Plaintiff's healthcare providers were not adequately informed of the potential dangers and/or defects of the Pelvic Mesh Product at issue herein.

89.     Defendant's failure to adequately warn about the risks and dangers associated with the Aris was a proximate cause of the damages and injuries to Plaintiff. Thus, Defendant is strictly liable to Plaintiff.

90.     By reason of the foregoing, Plaintiff has damages in an amount in excess of the jurisdiction limits of all the lower courts which would have had jurisdiction. Specifically, Plaintiff has suffered and in all reasonable probability will continue to suffer from dyspareunia, vulvodynia, nerve pain/irritation, groin pain, thigh pain, urinary issues, vaginal scarring, urethral scarring, bladder wall scarring, depression, and anxiety, as well as other symptoms and damages, including severe and permanent pain, suffering, disability, impairment of mobility, impairment of sexual function, impairment of bowel and bladder function, subsequent surgical removal of the mesh, loss of enjoyment of life, and economic damages.  Plaintiff did not suffer from said injuries prior to implantation of the Aris device, and upon information and belief would not have suffered these injuries absent implantation of the Aris device.  In addition and in the alternative, Plaintiff suffered from pre-existing injuries/conditions which were aggravated, exacerbated, and/or

accelerated by implantation of the Aris device.

91.     WHEREFORE, Plaintiff demands judgment against Defendants for compensatory damages, for punitive damages, and for costs in excess of $75,000 and such other relief as this Court deems just and for a trial by jury on all issues so triable as a matter of right.

## COUNT II: NEGLIGENCE (DESIGN DEFECT)

92.     Plaintiff re-alleges and incorporates by reference each of the foregoing paragraphs of this Complaint as if fully set forth herein and further allege as follows:

93.     At all times herein mentioned, Defendant was engaged in the business of designing, manufacturing, labeling, and distributing, supplying, and/or selling its Pelvic Mesh Products, including the Aris device implanted into Plaintiff.

94.     Defendant owed to Plaintiff and the public a duty to act reasonably and to exercise ordinary care in designing the Aris device.  For the reasons set forth above, Defendant have breached said duty of care in that Defendant failed to use the amount of care in the designing the Aris that a reasonably careful product designer would have used in similar circumstances to avoid exposing others to a foreseeable risk of harm. Defendant's violations the duties of ordinary care and skill owed by Defendant to Plaintiff include but are not necessarily limited to:

(1) Designing a product (the Aris) which, at the time conveyed, was not in conformity with the generally recognized state of the art applicable to the safety of the product at the time the product was designed, manufactured, packaged, labeled and/or sold;

(2) Designing the Aris to be inserted into and through an area of the body that is blood vessel rich, nerve dense, and bacteria laden leading to excessive blood loss and vascular damage, permanent nerve injury and associated chronic, intractable neuropathic pain, contaminated permanently-implanted mesh causing chronic infections, subclinical infections and biofilms, enhanced chronic inflammatory response, chronic wound healing with tissue destruction, as well as numerous other adverse reactions and serious and permanent injuries without producing any additional therapeutic benefit when compared to other surgical treatment options for SUI;

(3) Designing the Aris to be inserted into and through the obturator internus muscles in the groin, when doing so produces a foreseeable risk of acute and chronic myofascial pain;

(4) Designing the Aris with arms and anchors that are designed to be permanently placed into the obturator internus muscles in the groin;

(5) Designing the Aris to be inserted into and through the obturator internus muscles in the groin, when doing so produces a foreseeable risk of obturator neuralgia and pudendal neuralgia (by aggravating the pudendal nerve as it runs through Alcock's canal) and when other available alternatives, including retropubic slings manufactured by Defendant at the time it was designing the Aris, did not pose this risk;

(6) Designing and using arms and anchors in the Aris which, when placed in the women such as Plaintiff, are likely to pass through contaminated spaces and

injure major nerve routes in the pelvic region;

(7) Designing the Aris to be inserted into and through an area of the body with high levels of bacteria that can adhere to the mesh, causing immune reactions and subsequent tissue breakdown and adverse reactions and injuries without producing any additional therapeutic benefit when compared to other surgical treatment options for SUI;

(8) Designing a product which creates of a non-anatomic condition in the pelvis, leading to chronic pain and functional disabilities when the mesh is implanted according to the manufacturers' instructions that are unique to polypropylene without providing any additional therapeutic benefit when compared to other non-polypropylene surgical treatment options for SUI;

(9) Designing the Aris in such a way that complete removal of the device may be impossible or impossible without multiple surgeries and/or substantial injury to the patient, despite knowledge that in some patients, complete removal might be medically necessary to address their symptoms;

(10)    Using polypropylene mesh in the design of the Aris when it was known that the use of polypropylene in the Aris and the foreseeable adverse tissue reactions, host defense response, and immune reactions that result from such material would lead to ongoing degradation of the mesh, shrinkage, perpetual scarification as the mesh degrades all of which have potential to produce adverse reactions and permanent injuries including but not limited to painful recurrent erosions, direct muscle and soft tissue injury, nerve entrapment or irritation of

adjacent nerves, and associated intractable neuropathic pain and myofascial pain;

(11)   Using polypropylene mesh in the design of the Aris when it was known that the mesh had a propensity to contract or shrink inside the body, that in turn cause surrounding tissue to be inflamed, become fibrotic, and contract, resulting in serious and permanent injury to the soft tissues and muscles of the pelvic floor without producing any additional therapeutic benefit when compared to other surgical treatment options for SUI;

(12)   Using polypropylene mesh in the design of the Aris when it was known that the mesh had a propensity to "creep," or to gradually elongate and deform when subject to prolonged tension inside the body;

(13)   Using polypropylene mesh in the design of the Aris when it was known that the inelasticity of the mesh caused the products to be improperly mated to the delicate and sensitive areas of the vagina and pelvis where they are implanted, and causing pain upon normal daily activities that involve movement in the pelvic region (e.g. intercourse, defecation, or walking) without providing any additional therapeutic benefit when compared to other surgical treatment options for SUI;

(14)   Using a polypropylene mesh weight and pore size in the Aris that prevented safe and healthy incorporation of native tissues into mesh fabric, which could lead to fibrotic bridging and encapsulation of the tissues;

(15)   Using polypropylene mesh in the design of the Aris when it was known that the mesh had a propensity to degrade, disintegrate, and fragment over time, which causes a chronic inflammatory and fibrotic reaction, and results in continuing injury over time;

(16)   Using polypropylene mesh in the design of the Aris when it was known that the mesh could produce hyper-inflammatory responses to collagen leading to problems including chronic pain and fibrotic reaction; and

(17)   Using polypropylene mesh in the design of the Aris when it was known that the mesh could stiffen and harden inside the body, producing pain and damage to surrounding tissues and organs.

95.   At all relevant times, safer alternative designs to the Aris existed. First, there were designs containing no synthetic, polymer-based sling material, such as the Burch Procedure colposuspension with delayed absorbable sutures, autologous fascia slings, and an allograft sling using a product like Repliform or other biological matrix; said slings would have been more biologically compatible with human tissue and would have therefore prevented the foreign body immune response that promotes degradation of the pelvic tissue and other complications. Second, there were slings constructed with less polypropylene such as Ultrapro; said sling, by utilizing less polypropylene, would have ameliorated the foreign body immune response that promotes degradation of the pelvic tissue and other complications described herein. Third, there were retropubic slings which, by not passing through the obturator internus muscle, would have reduced and/or eliminated the risk of obturator neuralgia and secondary irritation to the pudendal nerve.

Finally, there were retropubic slings comprised of a polymer-based alternative to polypropylene, such as Polyvinylidene fluoride (PVDF), a material which has greater biostability and biocompatibility than polypropylene, preventing the level of foreign body immune response that promotes degradation of the pelvic tissue and other complications described herein.

96.     Plaintiff and/or her implanting physician used and was implanted with Defendant's Aris in a manner that was reasonably foreseeable. Plaintiff believed the Aris would address her stress urinary incontinence, and did not know—nor did she have any reason to know, based upon the information provided to her and provided to her implanting physician regarding the risks of the Aris, that she would sustain the injuries from the Aris described herein.

97.     As a direct and proximate result of these design flaws and Defendant's failure to use the amount of care in the designing the Aris that a reasonably careful product designer would have used in similar circumstances to avoid exposing others to a foreseeable risk of harm, Plaintiff has suffered and in all reasonable probability will continue to suffer from dyspareunia, vulvodynia, nerve pain/irritation, groin pain, thigh pain, urinary issues, vaginal scarring, urethral scarring, bladder wall scarring, depression, and anxiety, as well as other symptoms and damages, including severe and permanent pain, suffering, disability, impairment of mobility, impairment of sexual function, impairment of bowel and bladder function, subsequent surgical removal of the mesh, loss of enjoyment of life, and economic damages. Plaintiff did not suffer from said injuries prior to implantation of the Aris device, and upon information and belief would not have suffered

these injuries absent implantation of the Aris device.  In addition and in the alternative, Plaintiff suffered from pre-existing injuries/conditions which were aggravated, exacerbated, and/or accelerated by implantation of the Aris device.

## COUNT III: NEGLIGENCE (MARKETING DEFECT)

98.    Plaintiff re-alleges and incorporates by reference each of the foregoing paragraphs of this Complaint as if fully set forth herein and further allege as follows:

99.    At all times herein mentioned, Defendant was engaged in the business of marketing, supplying, and/or selling, the Aris, including the Aris implanted into Plaintiff.

100.    At all times relevant hereto, Defendant owed to Plaintiff and the public a duty to act reasonably and to exercise ordinary care with respect to the marketing of the Aris, and to adequately warn of the risk and dangers of the Aris.

101.    Defendant owed to Plaintiff, and Plaintiff's physicians, and the public a duty if and when warning about its products, including the Aris, to provide accurate, reliable, and completely truthful information regarding the safety and any dangerous propensities of the Aris and to provide accurate, reliable, and completely truthful information that the Aris was unreasonably dangerous, taking into account the risks and benefits of the product.

102.    At all times relevant hereto, Defendant breached the aforementioned duties in that Defendant negligently and carelessly failed to adequately warn regarding the risks of the Aris.  Said negligent acts and omissions include but are not limited to:

a. Failing to properly and adequately warn and instruct Plaintiff and her healthcare providers of the design defects, risks and potential complications

42

associated with Defendant's Pelvic Mesh Products, including the Aris Pelvic Mesh Product at issue in this case (said design defects, risks and potential complications being more fully articulated in Paragraphs 56 (a)-(i), 57 (a)-(u), 83 (a)-(ff), and 86 (a)-(s) above);

b. Failing to properly and adequately warn and instruct Plaintiff and her healthcare providers as to the proper candidates for the implantation and use of Defendant's Pelvic Mesh Products, including the Aris Pelvic Mesh Product at issue in this case;

c. Failing to properly and adequately warn and instruct Plaintiff and her healthcare providers as to the safest and most effective methods of, implantation and use of Defendant's Pelvic Mesh Products, including the Aris Pelvic Mesh Product at issue in this case;

d. Failing to properly and adequately warn and instruct Plaintiff and her healthcare providers with regard to the inadequate research and testing of the Pelvic Mesh Products, including the Aris Pelvic Mesh Product at issue in this case;

e. Failing to properly and adequately warn and instruct Plaintiff and her healthcare providers that that Defendant lacked a safe, effective procedure for removal of the Pelvic Mesh Products, including the Aris Pelvic Mesh Product at issue in this case;

103.    The above acts of Defendant constitute violations of the duty of ordinary care and skill owed by the Defendant to Plaintiff.

104.    Plaintiff and/or her implanting physician used and was implanted with Defendant's Aris in a manner that was reasonably foreseeable.

105.    As the direct and proximate result of Defendant's negligent breach of its aforementioned duties with respect to the Aris, Plaintiff suffered the injuries and damages alleged herein. Specifically, Plaintiff has suffered and in all reasonable probability will continue to suffer from dyspareunia, vulvodynia, nerve pain/irritation, groin pain, thigh pain, urinary issues, vaginal scarring, urethral scarring, bladder wall scarring, depression, and anxiety, as well as other symptoms and damages, including severe and permanent pain, suffering, disability, impairment of mobility, impairment of sexual function, impairment of bowel and bladder function, subsequent surgical removal of the mesh, loss of enjoyment of life, and economic damages.   Plaintiff did not suffer from said injuries prior to implantation of the Aris device, and upon information and belief would not have suffered these injuries absent implantation of the Aris device.   In addition and in the alternative, Plaintiff suffered from pre-existing injuries/conditions which were aggravated, exacerbated, and/or accelerated by implantation of the Aris device.

106.    WHEREFORE, Plaintiff prays for judgment against Defendant as hereinafter set forth.

## COUNT IV: NEGLIGENT UNDERTAKING

107.    Plaintiff repeats and re-alleges the paragraphs above as if specifically set forth herein and additionally or in the alternative, if same be necessary, further alleges as follows:

108.    As part of marketing its products, including the Aris product at issue, Defendant offered physicians training through its Physician Education Program (PEP). The education options included classes, cadaver labs, and surgery observations.  As part of its PEP, Defendant specifically undertook to train physicians, such as the implanting physician at issue in this case, on proper surgical techniques concerning the Aris, and would enlist other physicians to train implanting doctors on said techniques.

109.    Where a Defendant undertakes takes tasks alleged to have been performed negligently and the undertaking was to render services to another that the defendant should recognize as necessary for the protection of third persons, a claim for negligent undertaking may arise.  *See Paz v. State of California* 994 P.2d 975, 980-81 (Cal. 2000).  Stated further, "one who undertakes to aid another is under a duty to exercise due care in acting and is liable if the failure to do so increases the risk of harm or if the harm is suffered because the other relied on the undertaking." *Scott v. C. R. Bard, Inc*., 231 Cal. App. 4th 763, 775 (Cal. App. 5th Dist., 2014).

110.    In the present case, Defendant owed Plaintiff and her physicians a duty because Defendant undertook to train physicians, including Plaintiff's healthcare providers, on the Aris product, an undertaking Defendant should have recognized as necessary for the protection of third persons (here, Plaintiff). Defendant breached that duty

when it failed to exercise ordinary care in said undertaking.  Specifically, Defendant:

> (a) Failed to train Plaintiff's physicians on how to remove the Aris;
>
> (b) Failed to train Plaintiff's physicians on how to diagnose mesh complications from the Aris;
>
> (c) Failed to train Plaintiff's physicians on the severity of some mesh complications from the Aris;
>
> (d) Failed to train Plaintiff's physicians on how to treat mesh complications from the Aris;
>
> (e) Failed to train Plaintiff's physicians on when removal of the Aris may be necessary; and
>
> (f) Failed to train Plaintiff's physicians on when referral to specialist(s) in treating mesh complications may be necessary.

111.   As the direct and proximate result of Defendant's negligent breach of its aforementioned duties with respect to the Aris, Plaintiff suffered harm; moreover, Defendant's carelessness increased the risk of such harm.

112.   Specifically, Plaintiff has suffered and in all reasonable probability will continue to suffer from dyspareunia, vulvodynia, nerve pain/irritation, groin pain, thigh pain, urinary issues, vaginal scarring, urethral scarring, bladder wall scarring, depression, and anxiety, as well as other symptoms and damages, including severe and permanent pain, suffering, disability, impairment of mobility, impairment of sexual function, impairment of bowel and bladder function, subsequent surgical removal of the mesh, loss of enjoyment of life, and economic damages.  Plaintiff did not suffer from said injuries prior to

implantation of the Aris device, and upon information and belief would not have suffered these injuries absent implantation of the Aris device. In addition and in the alternative, Plaintiff suffered from pre-existing injuries/conditions which were aggravated, exacerbated, and/or accelerated by implantation of the Aris device.

113.    WHEREFORE, Plaintiff prays for judgment against Defendant as hereinafter set forth.

## COUNT V: NEGLIGENT MISREPRESENTATION

114.    Plaintiff repeats and re-alleges the paragraphs above as if specifically set forth herein and additionally or in the alternative, if same be necessary, further alleges as follows:

115.    Defendant from the time that the Aris was first tested, studied, researched, first manufactured, marketed and distributed, and up to the present, made false representations, as previously set forth herein, to the Plaintiff, her prescribing physicians and healthcare providers, the medical, scientific, pharmaceutical and healthcare communities, and the public in general, including, but not limited to, the misrepresentation that the Pelvic Mesh Product was safe, fit, and effective for the treatment of stress urinary incontinence. Said representations made by Defendant were false, for the reasons articulated in more detail above, and were made with the intention that Plaintiff and/or her prescribing physicians and healthcare providers would rely upon them.

116.    Even if, *arguendo*, Defendant may have honestly believed that the said representations were Defendant had no reasonable grounds for believing the representation was true when Defendant made them, as the available medical literature, testing data, and

internal company documents showed said representations were false.

117.   Plaintiff and/or her prescribing physicians and healthcare providers reasonably relied on the false representations that the Pelvic Mesh Product was safe, fit, and effective for the treatment of stress urinary incontinence, and said reliance was a substantial factor in bringing about harm suffered by Plaintiff.

118.   Specifically, Plaintiff has suffered and in all reasonable probability will continue to suffer from dyspareunia, vulvodynia, nerve pain/irritation, groin pain, thigh pain, urinary issues, vaginal scarring, urethral scarring, bladder wall scarring, depression, and anxiety, as well as other symptoms and damages, including severe and permanent pain, suffering, disability, impairment of mobility, impairment of sexual function, impairment of bowel and bladder function, subsequent surgical removal of the mesh, loss of enjoyment of life, and economic damages.   Plaintiff did not suffer from said injuries prior to implantation of the Aris device, and upon information and belief would not have suffered these injuries absent implantation of the Aris device.   In addition and in the alternative, Plaintiff suffered from pre-existing injuries/conditions which were aggravated, exacerbated, and/or accelerated by implantation of the Aris device.

119.   WHEREFORE, Plaintiff prays for judgment against Defendant as hereinafter set forth.

## **PUNITIVE DAMAGES**

120.   At the time the Defendant designed and marketed the unreasonably dangerous and defective Aris device, and failed to adequately warn Plaintiff or her physicians of the dangerous and defective nature of the Aris and thereby caused Plaintiff's

injuries, the Defendant knew, or in the exercise of the appropriate degree of care should have known, that its egregious conduct and products created a high degree of probability of injury to others and thereby showed complete and reckless indifference to, and conscious disregard for the safety of others, including Plaintiff. Defendant's egregious conduct, including that described above herein, was intentional, fraudulent, malicious, and/or reckless because Defendant was aware of and consciously disregarded the substantial and unjustifiable risks constituting a gross deviation from the applicable standard of care. As such, the conduct warrants the imposition of punitive damages under all applicable legal standards.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands trial by jury, that Defendant be cited to appear and answer herein, and prays for judgment against Defendant Coloplast as follows:

A. Judgment against the Defendant Coloplast Corporation holding it liable for compensatory damages in a reasonable amount determined to be fair and just by the jury in this cause sufficient to adequately compensate Plaintiff for her harms and losses, including but not limited to:

    a. Past and future economic damages according to proof at the time of trial, including damages for past and future medical and incidental expenses and for past and future loss of earnings and impaired earning capacity;

    b. Past and future non-economic damages according to proof at the time of trial, including damages for past and future physical pain and suffering, past and future physical impairment, past and future physical disfigurement, past and

future mental and emotional distress, as well as past and future unjust

hardship, inconvenience, and loss of life enjoyment;

B.     An award of punitive and exemplary damages in a reasonable amount

determined to be fair and just by the jury;

C.     For costs, attorneys' fees, interest, or any other relief, monetary or

equitable, to which they are entitled; and

D.     For such other and further relief as the Court may deem just and proper.


Dated:  August 17, 2021

Respectfully submitted,

*/s/ Laura J. Baughman*
LAURA J. BAUGHMAN
California Bar No. 263944
MARTIN BAUGHMAN, PLLC
3141 Hood Street, Suite 600
Dallas, Texas 75219
(214) 761-6614
(214) 744-7590 (facsimile)
lbaughman@martinbaughman.com

**ATTORNEY FOR PLAINTIFF**